UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                                    PLAINTIFF

v.                                                                                   3:15-CR-43-CRS

DALTONIA DUNCAN                                                              DEFENDANT

### MEMORANDUM OPINION AND ORDER

This matter is before the court on motion of the United States seeking an order that the defendant, Daltonia Duncan ("Duncan"), be involuntarily medicated in order to attempt to restore his mental competency to enable him to to stand trial. (DN 30). For the reasons set forth herein, the motion will be denied.

The following background facts are taken from the investigative report documenting the incident leading to Duncan's arrest.[1] These facts are recounted herein and taken as true solely for the purpose of addressing the present motion.

On the afternoon of August 4, 2014 in Breckinridge County, Kentucky, Duncan called city hall concerning an argument he was having with his mother, Sally Robertson. A Hardinsburg officer and a county sheriff went to the home to investigate the call. Robertson met the officers outside and related that she and Duncan were arguing over an unpaid water bill. She stated that Duncan locked himself in his bedroom when the officers arrived. Upon seeing

---

[1] This is referred to as a "draft" report, and was attached to the defendant's supplemental brief in opposition to forced medication. (DN 40-1). The defendant received this report from the United States in discovery and incorporates it into his brief. (DN 40, pp. 1-2).

Duncan looking out of the window, the officers encouraged him to come outside. He did so voluntarily. Once outside, Duncan and Robertson began arguing over the water bill again. During the dispute, Robertson informed the officers that Duncan had firearms in his car. When the officers asked for permission to look in his car, Duncan refused.

Duncan stated that he only had two homemade silencers which were locked in his bedroom closet. Duncan gave verbal permission for the officers to retrieve the silencers. He accompanied them to his room and unlocked the closet door where an officer retrieved a box which contained two homemade silencers. Duncan showed the officers diagrams in a spiral notebook illustrating how he designed and built the silencers. Officers seized the spiral notebook and four marijuana pipes from Duncan's bedroom.

After returning outside, the officers again sought consent to search Duncan's car for firearms. Duncan's mother indicated that Duncan had taken a black bag with firearms to his car prior to the officers' arrival. Duncan eventually agreed to permit a search of the vehicle, and provided the keys.[2] In the trunk, under the spare tire cover, was a black bag containing two pistols. Duncan was then arrested for two counts of possession of a handgun by a convicted felon. Upon arrival at the detention center, he was also charged with terroristic threatening, possession of marijuana, and possession of drug paraphernalia. The arresting officer stated that Duncan stated to him that when he got out of jail he was going to get a rifle and shoot all of the police officers and jailers.

When subsequently interviewed, Robertson stated that Duncan had had the firearms for a while, that he sometimes carried them with him inside the home, and that she would sometimes go into her room and lock the door out of fear of Duncan.

---

[2] It is unclear what occurred to change Duncan's mind, but apparently there was some discussion which convinced him to acquiesce. Those details are not of importance here.

On May 5, 2015, a federal grand jury returned an indictment against Duncan charging one count of possession of a firearm by a convicted felon, charging that he possessed two pistols and ammunition. (DN 1). The indictment recites the foundational prior felony for the charge as a 2008 felony conviction for being a felon in possession of a firearm. Duncan apparently had another felon in possession conviction in 1997, various convictions, both misdemeanor and felony, for terroristic threatening and assault in 1994, 1995, 1996, and a conviction for retaliating against a participant in the legal process in 2009.

In June of 2015, counsel for the defendant sought a hearing to determine Duncan's mental competency and an order for a psychiatric evaluation addressing competency to stand trial and sanity at the time of the offense. There was no objection by the United States, and the order for evaluation was granted.

The court received a psychiatric report in October of 2015. The court conducted a competency hearing during which the defendant was afforded an opportunity to testify. Duncan made a statement to the court which he affirmed under oath. The only additional evidence was the forensic evaluation report. The court found by a preponderance of the evidence that Duncan was presently suffering from a mental disease or defect rendering him incompetent to the extent that he was unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. Duncan was committed for hospitalization and treatment pursuant to statute and to determine whether a substantial probability existed that in the foreseeable future he would attain the capacity to permit proceedings to go forward.

In July, 2016, the court received a competency restoration study concerning Duncan in which the evaluators determined that he remained incompetent to proceed to trial and opined that involuntary administration of psychotropic medications with further treatment for a four-month

period would be necessary to restore Duncan's competency to proceed to trial. Duncan's counsel requested time to obtain state records to determine whether Duncan had been medicated in the past, whether it was effective, and whether he experienced side effects. After some difficulty, counsel was able to reach an accommodation with the Commonwealth, and we are now able to go forward with further evaluating the propriety of involuntarily medicating the defendant.

The United States filed a motion seeking an order for the involuntary administration of medication pursuant to *Sell v. United States*, 539 U.S. 166 (2003). (DN 30). Duncan does not believe that he is mentally ill and has refused to take psychotropic medications voluntarily. He objected to the motion for the involuntary administration of medication on the ground that the appropriate circumstances justifying the infringement on personal liberty through involuntary medication authorized by *Sell* are "rare," as acknowledged in the *Sell* case itself:

> [T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render the defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important government trial-related interests.

*Id.* at 179. (DN 31). He urged that there are "special circumstances" that lessen the important governmental interest in prosecution asserted in this case. *Id.* at 180.

The court held a telephonic conference on the matter and determined that additional briefing was needed on the issue of whether the crime charged in this case is sufficient to represent an important government interest. Both parties filed the requested briefs (DNs 35, 40). The defendant also filed a Notice of Insanity Defense (DN 36) and Notice of Intent to Introduce Expert Testimony in Support of Insanity Defense (DN 37).

In order to even consider the medical appropriateness of psychotropic drugs, their potential side effects, and whether a substantial likelihood exists that their administration will render the defendant competent to stand trial, the court must first conclude that important governmental interests are at stake to warrant the deprivation of a defendant's liberty interest; that is, the defendant's freedom to reject medical treatment. *Id.*

The Supreme Court held in *Sell* that "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important." *Id.* The Court further found that the government has a substantial interest in timely prosecution, and a concomitant, constitutionally essential interest in assuring that the defendant receives a fair trial. *Id.* It noted, however, that the court must consider the individual facts of each case, and that "special circumstances" may lessen the importance of that interest. *Id.* The burden lies with the government to establish by a preponderance of the evidence that the *Sell* factors are met. *United States v. Grigsby*, 712 F.3d 964, 969 (6th Cir. 2013).

It is established in this circuit that "the maximum statutory penalty is the most objective means of determining the seriousness of a crime." *United States v. Green*, 532 F.3d 538, 549 (6th Cir. 2008). *See also*, *Lewis v. United States*, 518 U.S. 322, 326, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996)(whether a crime is "serious" should be determined by its maximum statutory penalty). Duncan has been charged under 18 U.S.C. 922(g) for possession of a firearm by a convicted felon, a charge that carries a maximum sentence of 10 years imprisonment, a period which has been found to evidence the congressional view that this crime is "serious." *Green*, 532 F.3d at 547-48, *citing United States v. Evans*, 404 F.2d 227 (4th Cir. 2005). However, the court "must consider the facts of the individual case in evaluating the Government's interest in prosecution." *See*, 539 U.S. at 180.

5

To that end, we note that the particular facts of this case lessen, somewhat, the importance of the government's interest in the prosecution of this defendant. That is not to say that we reject wholesale any "overriding" or "essential" interest in prosecuting felons in possession of firearms which might warrant involuntary administration of medication under *Sell*. We simply do not find that sort of compelling interest here. Duncan did not brandish the firearm, nor was law enforcement alerted that Duncan was engaged in some form of threatening behavior. Rather, it was Duncan himself who called "city hall" to report that he was arguing with his mother. When law enforcement officers arrived, Duncan had silencers locked away in his closet and guns locked away in his car. Duncan volunteered the information concerning the silencers and took the officers to them. He did not deny that he had firearms locked in the trunk of his car. While he did not initially permit the officers to retrieve them, he eventually acquiesced and gave the officers the keys.[3]

We have here, essentially, a status offense under these facts, albeit a serious one. Duncan, a mentally ill individual, has an argument at his home with his mother over an unpaid water bill and he essentially enables law enforcement to discover that he is in possession of firearms. We find the facts resulting in Duncan's arrest for this crime lessen the importance of the government's interest in his prosecution. In this court's view, this sequence of events stands in sharp contrast to a narcotics-trafficking felon who uses a firearm to protect his stash, or a felon who uses a weapon to threaten violence or to commit a bank robbery.

The United States remarks on Duncan's prior criminal history in support of its contention that it has a compelling interest in furthering the prosecution of an individual with a long history of violent offenses and unlawful possession of firearms. Notably, the United States cites no

---

[3] The indictment also charges Duncan with possession of ammunition. The court has no information concerning any ammunition seized from the defendant.

authority directing the court to focus on a defendant's *prior conduct* in evaluating whether to order involuntary administration of medication. Indeed, we find that such an interpretation of the directives of *Sell* would lead down a slippery slope in seeking to justify intrusions into a defendant's constitutionally protected privacy and security. This court reads *Sell* to require consideration of the crime charged and the facts of the individual case as they concern the interest of the government in prosecution of that crime.

Additionally, we note that Duncan was arrested on the current charge in August, 2014. The prior offenses recounted by the United States date back as far as 1994. The most recent of those convictions was 2009, and the most recent firearms conviction was 2008, respectively. These are not exactly current events.[4]

Two things of note were not mentioned by the United States. First, the investigative report indicates that Duncan's mother stated that she was so fearful of Duncan that she would sometimes lock herself in her bedroom. When law enforcement went back and talked to her at a later date, she reported that Duncan would sometimes carry a firearm around the house with him. Second, Duncan purportedly told one of the officers after his arrest that when he got out he was going to get a rifle and shoot all the police officers and jailers. (DN 40-1). These statements were made contemporaneously with the arrest of Duncan on the present charge. However, the United States did not reference them.

Without further context, the court cannot determine the significance, if any, of Duncan's mother's comments. He apparently did not threaten her or have a firearm in hand at the time of the argument leading to Duncan's arrest. She did not call law enforcement during this incident. Duncan did. Similarly, the court is unsure what to make of the threat to kill all of the officers

---

[4] The court expresses no opinion concerning the relevance of this prior conduct in a civil commitment proceeding in assessing dangerous. We discuss these prior convictions solely for the purpose of illustrating that they should not be considered part of the "facts of the individual case" under *Sell*.

and jailers. Clearly, Duncan was angered by his arrest. The possibility that Duncan was mentally infirm at the time is certainly not out of the question, and the issue of insanity has now been raised via a notice filed in the case. The court will not ascribe any further significance to this statement or to the statements of Duncan's mother absent an assertion by the United States that the court should do so.

*Sell* counsels that matters such as the potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution. The same, *Sell* says, is true of the possibility that the defendant has already been confined for a significant amount of time for which he would receive credit toward any sentence ultimately imposed. *Sell*, 539 U.S. at 180-81. We will look at these issues in turn.

With respect to the question of the potential for future confinement, the parties are in agreement that Duncan may well be a candidate for civil commitment under 18 U.S.C. § 4246. He has been found not competent to proceed to trial. His evaluators have opined that a substantial probability exists that Duncan competency to stand trial can be restored with appropriate treatment and antipsychotic medicine, but less intrusive methods of treatment such as psychotherapy are not likely to restore his competence.

Although, at this time, Duncan has not received a full risk assessment to determine whether he would pose any danger if released, the court may consider whether his continued refusal to voluntarily take antipsychotic medications may result in confinement in an institution. If he is found to pose a danger to himself or others, "the risks that ordinarily attach to freeing without punishment one who has committed a serious crime" would be lessened. *United States v. Stephenson*, No. 1:10-CR-206, 2011 WL 3738967, *8 (W.D.Mich. August 23, 2011), *quoting Sell*, 539 U.S. at 180.

We note that Duncan has filed a notice of intent to rely on the insanity defense. He also filed a notice that he may introduce expert testimony at trial relating to mental disease or defect. The defendant has not identified such an expert nor has any report has been produced. While the defendant states that "it is abundantly clear from the psychiatric evaluations in this case that [Duncan] was incompetent at the time of the alleged offense," (DN 40, p. 6), there is an addendum to the forensic report in the record which opines that Duncan was not suffering from a mental disease or defect at the time of the crime such that he was unable to appreciate the nature and quality or wrongfulness of his actions.

The issue of Duncan's capacity at the time of the crime is presently before the court because the possibility of a verdict of not guilty by reason of insanity "would undermine the government's interest in prosecution." *United States v. Grigsby*, 712 F.3d 964, 971 (6th Cir. 2013); *Stephenson*, *supra.* at *8. However, as the record stands presently, the sole expert report addressing this issue suggests that Duncan was likely sane. As it appears that there may be a difference of opinion among experts if the defense is pursued at trial, we cannot find that this hypothetical scenario presents a "special circumstance" in this case.

With respect to the matter of potential sentence, Duncan has been in custody since August, 2014. The forensic examiners have indicated that on average a full four-month period for treatment with psychotropic medications is required to restore an individual to competence. Prior to entry of an order for involuntary medication, the court must receive a proposed treatment plan and consider its appropriateness for the defendant. This would require an additional number of weeks. Upon completion of the course of treatment, the court would then conduct a hearing to determine whether Duncan was competent to stand trial. If treatment was successful and he was found to be restored to competence, Duncan and the United States would require a period of time

to prepare for trial. After trial would come a period of time for preparation of a presentence report and sentencing. If we assume another ten months passes from this date through treatment, trial, and sentencing, Duncan would have been in custody for 38 months at the time he would begin service of any sentence. This is, of course, sheer speculation as to the time required to complete all of these processes. However, *Sell* notes that the government possesses a "concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one." 539 U.S. at 180. Thus the defendant must be afforded sufficient time to assist his attorney and prepare for trial once restored to competence.

Duncan suggests that if he proceeds to trial, with a criminal history category of V and an offense level of 14, the advisory guidelines range would be 33 to 41 months. DN 40, pp. 2-3. The United States' hypothetical calculation is significantly higher inasmuch as it finds the offense level of 20 and a criminal history category of VI, yielding an advisory guidelines range of 70 to 87 months. However, the United States also states that the offense level might come down as much as 3 points, and that "many of [Duncan's] prior convictions may not count toward his criminal history score." DN 35-2, p. 8. Even if the offense level was reduced by three points and he remained at category VI, the advisory range drops to 51 to 63 months. If Duncan should enter a plea of guilty, these advisory ranges would drop further. We find, therefore, that it is unlikely that Duncan would face a lengthy sentence were he convicted of the crime charged against him. The amount of time he will have been in custody and which would be credited to any sentence imposed constitutes a special circumstance in this case which lessens the government's important interest in prosecution.

In sum, we must balance the important interest in rendering Duncan competent to stand trial against the constitutional intrusion that involuntary administration of medication would

entail. On balance, we conclude that on the facts of this case, the United States has failed to establish by a preponderance of the evidence that its interest in prosecution is sufficiently serious to warrant involuntarily medicating the defendant.

Motion having been made and for the reasons set forth hereinabove and the court being otherwise sufficiently advised, **IT IS HEREBY ORDERED AND ADJUDGED** that the motion of the United States for an order to involuntarily administer medication (DNs 30, 39 is **DENIED.**

**IT IS SO ORDERED.**

December 16, 2016

**Charles R. Simpson III, Senior Judge**
**United States District Court**